FELIX GUTKIND, Respondent, *v.* GEORGE LUEDERS AND COMPANY, Appellant.

(Argued April 25, 1935; decided May 21, 1935.)

*A. S. Andrews* for appellant.

*Edward E. Hoenig, Sidney S. Bobbé* and *Joseph Eisinger* for respondent.

CRANE, Ch. J. The plaintiff is a distiller, manufacturer and blender of essential oils in Malaga, Spain. The defendant is a manufacturer of and dealer in such essential oils in New York. In 1920 the plaintiff sold to the defendant red thyme oil, guaranteed pure forty per cent phenol content. This action is brought to recover the price of part of this sale and damages for failure to accept full delivery. The defendant counterclaims, alleging damages for breach of warranty in that the phenol content was on the average of only thirty-five per cent.

A trial was had before the court without a jury, which resulted in a judgment for the plaintiff in the sum of $23,329.07, which included the balance of the purchase price, damages for breach, and interest.

Red thyme oil is produced by a distillation of an herb thyme, of which there are several varieties. The phenol content of the oil is the valuable part; the Spanish product varies in phenol content from twenty-eight per cent to seventy-four per cent by volume, while the variety coming from other places varies from twenty-eight to fifty-three per cent by volume. Whether these percentages be exact or not, the fact is conceded that the forty per cent pure phenol content which the plaintiff warranted the defendant had to be produced by either reducing or raising the phenol content resulting from distillation. This the plaintiff did at his place of business in Malaga, Spain,

before shipping to the defendant. The oil was put in drums which contained a sort of screw cap, that is, the cap screws on with a long iron bar which "screws them hermetically." This was all done by the plaintiff before delivery.

The parties have stipulated as to the shipments which reads in part as follows: "That on or about the 23rd day of July, 1920, at Malaga, Spain, the plaintiff and the defendant entered into an agreement wherein and whereby it was mutually agreed that the plaintiff sell to the defendant and the defendant purchase from the plaintiff 10,000 kilograms of red thyme oil for technical use only of 40% phenol content for which the defendant agreed to pay the sum of 19 pesetas per kilo, cost and freight, New York, together with discharge expenses and expenses for consular invoice, payment to be made in cash at Malaga, Spain, against delivery of documents."

Without quoting further from the stipulation, it is enough, I think, to say that shipments commenced July 28, 1920, were made on September 25, 1920, October 8, 1920, and the 21st day of October, 1920, by various drums of oil being placed on ships at Malaga, Spain, for which the plaintiff was paid, as it was a c. i. f. contract. On the 18th of November, 1920, the plaintiff sold the defendant another 10,000 kilograms of red thyme oil of about forty per cent phenol content, for which the defendant agreed to pay the sum of twenty-one pesetas per kilo, cost and freight, New York, together with discharge expenses and expenses for consular invoice, payment to be made in cash at Malaga, Spain, against delivery of documents; shipments to be made to the end of December, 1920. Three drums of this merchandise were shipped, consigned to the defendant, for which it refused to pay, having canceled the order while the goods were in transit, and refused to take the balance of the order in a letter of cancellation dated December 1, 1920, sent to the plaintiff through its agent Vogelin, in Spain.

From these stipulated facts we understand somewhat better the plaintiff's complaint. He sues for the price of this three-drum delivery under the contract of November 18, and for damages resulting from the failure of the defendant to take the balance of the oil sold. The defendant, on the other hand, having paid in cash for prior deliveries, refuses to pay any more, and counterclaims for breach of warranty.

There seems to be little question on the evidence about the phenol content of the oil sold. Mr. Felix Gutkind was a witness for himself upon the trial and admitted that to reduce the phenol content to forty per cent he had used four or five other ingredients which adulterated the product and that, with the consent of Vogelin, the defendant's agent, he had used triacetin to raise the phenol content when it was lower than it should be. Triacetin is an acid and is not a phenol. He testified as follows regarding this matter:

" Q. So that if the phenols appeared to be less than 40 you added triacetin to bring up the apparent phenol content to 40, is that right? A. A small amount.

" Q. You added a small amount to bring up the apparent phenol content to 40 per cent? A. Yes.

" Q. Did you know at that time that this test would make triacetin appear as a phenol? A. Yes.

" Q. And was that the reason why you put the triacetin in? A. No, not the only reason.

" Q. Was it one of the reasons? A. One of the reasons. If there are missing one or two degrees, we put it in.

" Q. Suppose it is missing 5 degrees, would you put it in then? A. No."

One of the tests to determine the phenol content is of no value to detect or measure the adulteration by triacetin. At another place Mr. Gutkind states that Vogelin, the defendant's agent, knew that he had used this diluting mixture. Vogelin, we may say in passing, was the defendant's agent in Spain, through whom it made its

contracts with the plaintiff. There is no evidence that he had any authority to waive the provisions regarding the phenol content of the thyme oil purchased, or that he could accept for the defendant inferior or lower grades. This action was not commenced until nearly six years after the sale, and was not brought on for trial until after Vogelin's death, which occurred in 1931, so that this case must be disposed of upon the issue of whether or not the defendant received at New York merchandise which the plaintiff agreed to deliver, and whether, if defective, rejection was made in time.

When the drums of oil arrived in various shipments, as above stated, they were immediately examined by the defendant's chemists, according to methods described by them. Nathaniel Roseman and Johannes Helle were the chemists. Roseman's tests disclosed the average phenol content of only thirty-four to thirty-five per cent. Joseph A. Crombie, the factory manager for the defendant, by a process of redistillation, discovered the deficiency in quantity of the phenol content of these drums of oil. The process used by him and the records made by Jacob T. Fehl, the foreman, were described but excluded. The exclusion of this testimony we think was error. Fehl was dead, but the records made by him as the result of this redistillation made by Crombie we think were competent. Someone had to take down the results in writing, and it was done in the usual and customary way, so far as Crombie's testimony discloses. If we read Crombie's testimony aright, he also vouches for the accuracy of these records. The conclusions reached by Crombie in making this test, which was in reality the only one accurately to determine the presence and amount of triacetin, should have been received for what they were worth. Further, some allowances must be made when such a question as this comes into court over twelve years after the event. Witnesses are dead and memory can only be checked or refreshed by records made at the time. We think this

factory practice of calling off and tabulating the results of redistillation, which takes a day or two, and the preservation of these records in the office by the clerks recording them, constituted some evidence bearing upon the question at issue. Whether or not they were accurate or reliable was a matter affecting their weight as evidence, but their competency was apparent.

The same thing we can say regarding the testimony of Harvey A. Seil, the expert from Columbia University, who examined certain samples just before the trial and in January of 1934. Some of the oil from the drums had been taken out by employees of the defendant, placed in bottles, tagged and sent to the office for preservation. The custody of these bottles was traced to the possession or control of the witness Feger, who testified that when he succeeded the witness Marth as foreman, he found all these samples sealed and intact, covered with a deep layer of dust, in a box under the safe, covered with paper, and he preserved the samples unopened until Dr. Seil took them. While of course it is not very satisfactory evidence to produce exhibits for examination twelve or fourteen years after a sale of goods, and for an expert then to declare them defective, we must always bear in mind that the competency of evidence depends upon the question at issue, and the manner in which it is presented.

Here we have a contest as to the phenol content of thyme oil. Concededly, it was adulterated to some extent. Did it come up to the warranty of the defendant — that it should be forty per cent, or about forty per cent phenol content — or did it drop so low that the defendant was justified in throwing up its contract and suing for breach of warranty? The plaintiff did not bring his action for six years and, in the meantime, the defendant had had the examinations stated and had apparently taken these samples, bottled them and preserved them for further use. Whether the bottles *did* contain the oil taken from the drums shipped by the plain-

tiff, and whether or not they had remained untouched and in a condition to show the phenol content twelve years before, is all a matter for the trier of facts. The evidence is not incompetent, although in this particular it may be very slim. We think that the evidence of Dr. Seil in this particular should have been accepted. Little harm is done in receiving such evidence in ascertaining the truth, provided full opportunity is given to expose its inaccuracy or its inadequacy. As to chemist Helle, we are of the opinion that exhibits consisting of memoranda of analyses of samples of the oil received, made by his assistant, and referred to in his deposition, should have been accepted for what they were worth.

We do not agree, however, with the appellant regarding the letters of the plaintiff to the defendant, Exhibits J, L and M for identification. True it is that these letters made statements about the " muddle " in the plaintiff's office, and that the plaintiff was not personally to blame for any defects, but all these statements were written in a spirit of compromise to try to bring about a settlement with the defendant and a continuance of business by some satisfactory arrangement as to the past unfortunate disagreement. The plaintiff as a witness was asked about these statements and could be cross-examined as to their meaning or any other previous statement made by him admitting facts favorable to the defendant, but we do not think these letters so closely connected with offers of settlement, written in more or less of a generous spirit to effect a compromise, should be received as evidence and admission of defective delivery. This would be to distort a friendly gesture or suggestion into a confession of guilt. If the defendant has no better evidence than such statements to prove the breach of warranty it should not succeed.

Something must be said by us regarding the Spanish law which the plaintiff has set up as a barrier to the defense and counterclaim, the specific point being that

claims must be presented within four days or thirty days after delivery. Commercial Code of Spain, as contained in this record, section 336, reads as follows:

"A purchaser who, at the time of receiving the goods, examines the same to his satisfaction shall not have the right of action against the seller on the ground of defect in the quantity or quality of the goods.

"A purchaser shall have a right of action against the seller for defect in the quantity or quality of goods received in bales or packages or containers, provided he brings his action within the four days following receipt of the goods, and provided the damage is not due to accident, to inherent defect of the goods or to fraud.

" In any such cases the purchaser may choose between rescission of the contract or performance thereof in accordance with agreement, together with the payment in each case, of the damages he may have suffered by reason of the defects or faults."

The purchaser in this case did not examine the goods at the time of delivery, so the four days' provision is not applicable, and the damage, if any, is due to inherent defect of the goods only discoverable on analysis. Even if the four days were applicable, the courts of this State would give no force and effect to them as being a short statute of limitations unenforceable in this State. Section 342, also insisted upon, reads as follows: "A purchaser who shall have not made claim for inherent defects in goods sold, within the thirty days following their delivery, shall lose all cause of action and right against the seller for such defects."

Considering the contract of sale and the sale as controlled by the Spanish law, the sales having been made in Spain and delivery made there (1 Williston on Contracts, § 97), yet there are certain parts of that law which the courts will not enforce as against our own citizens. A provision of law which would nullify the contract and furnish no defense whatever to a defendant as against the fraud

or breach of a seller would not receive recognition here. A short statute of limitations may accomplish such a result. The delivery referred to in this statute could not mean the delivery in Malaga, Spain. It took the ships a good part of the thirty days to get here. Such an interpretation would render examination of the oil by any chemical process after receipt here almost impossible. If we apply this thirty-day rule we must give it the interpretation to mean a delivery at the place of business of the buyer under such conditions that he is enabled to make the proper and usual examination or test to see if he has received what he bargained for; in other words, the purchaser must have a reasonable opportunity to receive and examine his goods. Immediately upon the arrival of the first shipment involved in this case the defendant made such examination and test and notified the seller through Vogelin, its agent in Spain.

Under our Uniform Sales Act, section 49, Personal Property Law (Cons. Laws, ch. 41), section 130, a purchaser is given a reasonable time within which to make a complaint. Where the foreign statute of limitation cannot apply from the very nature of the contract, or because it is unreasonable in its effect, we should apply our own law and give to the purchaser a reasonable time to make his examination and reject the goods. (*National Surety Co.* v. *Ruffin*, 242 N. Y. 413; *Laurencelle* v. *Laurencelle*, 217 App. Div. 159; *Reilly* v. *Steinhart*, 217 N. Y. 549.) Such cases as *Apfelberg* v. *Lax* (255 N. Y. 377) and *Benton* v. *Safe Deposit Bank* (255 N. Y. 260) and *Hutchinson* v. *Ward* (192 N. Y. 375) deal with limitations which are part of the substantive right, that is, the right is created provided the remedy is sought within a limited time. Not always is it easy to distinguish between a right and a remedy when dealing with time limitations. The distinction seems to be between what were common law rights and those created by statute. However, reason indicates that in this case our

courts should not enforce this thirty-day limitation after delivery as it virtually deprives our citizens of any right or relief.

As before stated, delivery was made in Spain in sealed containers called drums, and the plaintiff must have known that inspection could not be made until the goods arrived in New York. Surely he could not have filled the containers with water and prevented the defendant from seeking redress if the vessels had been delayed in reaching here before the thirty days had expired. For instance, seven drums were shipped from Spain on September 25, 1920, by steamship *Cabo Creux*, which docked at New York on October 28, 1920, more than thirty days after delivery in Spain. Was there no redress at all in the courts of New York for this defendant when the merchandise proved defective or not according to warranty? To state the proposition is to reveal the impossibility of applying the thirty days' limitation of the Spanish law. It was never meant or intended to apply to such a situation where inspection only could be made in a foreign country and the parties had not stipulated for inspection or examination at the home port. We find, therefore, that none of these provisions of the Spanish law bars the defendant's claim. According to the Civil Code of Spain, section 1484, we find that the seller is liable: " The seller is liable for any hidden defects which the thing sold may have if they render it unfit for the use for which it was intended, or if they diminish its fitness for such use to such an extent that had the purchaser known the defects, he would not have acquired the thing or would have given the lower price for it; but the seller shall not be liable for patent or visible defects, nor for those not visible, where the purchaser is an expert who by reason of his trade or profession ought easily to have detected them."

We have above stated that, on the last order, for which this action has been brought, the defendant received part of the goods but refused to pay for them and canceled

the order because of breach of warranty. This does not prevent the defendant from pressing its defense in this action for price, or setting up its counterclaim for damages for breach of warranty, if any have been sustained. (*Baxter* v. *Savoy Shirt Co.*, 238 N. Y. 106; *Portfolio* v. *Rubin*, 233 N. Y. 439.)

With this summary review of a case rendered somewhat difficult because of the nature of the merchandise, the subject of the controversy, and the delay in bringing the issues to a hearing, we conclude that the judgment of the Appellate Division and that of the Trial Term should be reversed, and a new trial granted, with costs to abide the event.

LEHMAN, O'BRIEN, HUBBS, CROUCH, LOUGHRAN and FINCH, JJ., concur.

Judgments reversed, etc.